Good morning, everyone. This is Judge Hamilton. I'll be presiding and timekeeping here this morning. Judge Mannion, can you hear me? I can. I hope you all can hear me. Yes. Judge Barrett, can you hear me as well? Yes, I can. All right. To all counsel, I'd like to extend the court's most sincere thanks for your cooperation in keeping the operations of the court running in the challenging times we're facing these days. This is, I think, my fourth telephone day of oral argument in the last several weeks, and it has worked relatively smoothly. We may just have to be a little more patient with each other in the case of occasional interruptions without visual signals. Let's see. Our first case for argument this morning is Lisa Purtue v. Wisconsin Department of Corrections, Appeal No. 19-2706. Mr. Olson, can you hear me? I can hear you five by five. And Mr. Kroski, can you hear as well? Yes, Your Honor. All right. Great. Mr. Olson, you're up first. I'll give you one minute. I'll give I should say I'll give all counsel a warning when you're one minute before your rebuttal time or the end of your total time, depending on which side you're arguing. Thank you, Your Honor. May it please the court. My name is Jeff Scott Olson. I've been arguing employment discrimination cases in this court for 40 years, and I've never looked forward to an oral argument more. It's an exciting time to argue a discrimination case in this court, because it's now clear that you don't need the McDonald-Douglas paradigm. You don't need a convincing mosaic, whatever that is. You don't need an identical male comparator in sex discrimination case. The interesting part is where do we go when we leave all these required paradigms behind? We know one thing for sure, and that's that it's going to be an interesting journey. I think this case shows maybe one place that we're going to be going in proving discrimination cases now that we are much freer than we have been in the past to look at the evidence. We know from the statistical evidence in this case that Dodge Correctional fits the statistical pattern of the whole Department of Corrections. In the department as a whole, over the five-year period roughly terminating with Lisa Pertut's termination. Counsel, can I interrupt you there to ask a question? I mean, you're right that you don't have to use the McDonald-Douglas framework, but you still do have to have enough evidence to permit a reasonable jury to draw the inference of discrimination to survive summary judgment. And this is my problem, it was Judge Peterson's problem with his statistical evidence. It may show some discrimination in the Department of Corrections, but it's quite general. I mean, am I correct that she does not dispute that the reason for her termination was her falsehood about the assault? Well, she does not believe something hit her, but she doesn't dispute that she was terminated because she said that the box hit her when it didn't. And so to win, you have to show, I gather your theory is that other correctional officers who were found to have lied in such disciplinary proceedings were not terminated, they were disciplined less harshly? That's right. So how does the statistical evidence about discrimination in the department as a whole help her for that particular claim? Here we go. In the department as a whole, they terminated 6% of the females and 3% of the males. At Dodge, they terminated 4% of the females and 2% of the males. What that tells us is that either across the men officers, or if that's not true, and misbehavior is equal, there's a big group of terminated women out there, half of them who would not have been terminated if they were men. Now, if we know that there is that group out there, we have to ask them, does the plaintiff have evidence from which he can prove to a jury that she's in that group? Could a jury find from Perttu's clean disciplinary record and the relative unimportance of her mistake that she's in that statistical slice of terminated females who would not have been terminated if they were men? We showed that a jury could find that she is in that group in two ways. One is Ed Wall's testimony, the former secretary of the department, who says that looking at her clean disciplinary record and looking at the gravity of the misconduct of which she was accused, termination would not be the expected result. What that tells us is that if she had been a male officer, she probably wouldn't have been terminated. That's quite a leap, counsel. Mr. Wall's testimony is an interesting feature of this case, but frankly, it prompted me to think this might be one of those cases where our repeated warnings about not acting as a super personnel department really come into play. That is, okay, when he was commissioner, Wall would not have fired, we can assume, either the plaintiff or males for lying about and exaggerating prisoner misconduct leading to prisoner discipline. Another commissioner has a different policy. Why is that evidence of discrimination? Those cases that talk about courts acting as super personnel agencies or departments mean that it's not illegal to make an unwise decision, or it's not illegal to make an unfair decision that's essentially arbitrary. But the fact that a decision is a substantial deviation from the ordinary criteria that an employer uses in making termination decisions can be evidence of discrimination. And we see that in the Stalter case about Walmart. You're not really trying, you talked about the relative unimportance of Officer Pertutti's mistake, a compare what superiors perceive as a lie about prisoner assault on a correctional officer with Mr. Stalter's taking a couple of Doritos out of an open bag in the break room. Oh, yeah, I think these two things are about equally trivial. Are you serious? Counsel, are you serious? Do you have any idea how many cases we see involving violence and the use of force by prisoners against other prisoners, or by guards against prisoners, where the integrity of the testimony about what happened is absolutely critical? I do. And you compare this to the, and yet you compare this to the Doritos from the open bag in the Walmart break room. This, this was a small, lightweight, empty paper box that had no chance of hurting anybody. Absolutely zero chance a jury could find a bodily harm. He could still, the prisoner still could have faced disciplinary consequences for that. And that's the point. And he did. And he faced disciplinary consequences for throwing the box. The fact that he missed her didn't save him from any disciplinary consequences. If he would have hit her, he would have gotten exactly the same consequences as he got. It was never going to be an assault because there was never any bodily harm. She wrote that she wasn't harmed in her, in her report. And bodily harm is an element of the assault rule in the Department of Corrections rules. Mr. Olson, can I ask you, you've, you've sued a number of, I think about a dozen individual defendants under 1983 here. Where in the decision making process do you think sex discrimination occurred? I think it occurred mainly in the warden's office. But I think it occurred then, thereafter, all the way up the line. Based on what? Based on Well, based on the warden representing that this was a serious act of misconduct, when he should have known that it wasn't ever going to be an assault, and, and that the prisoner was guilty of disrespect and disruptive behavior. Mr. Olson, Mr. Olson, excuse me, I'm not, we don't run prisons. And there were four people in the chain of command that went up, each discussed this issue, and each came out the same way. Now, you could disagree with Ongoing, and you mentioned there may be 12 other people involved somewhere along the line. But it does appear to me that if we have to, if we go the other way, we're overriding what seems to be a process where it wasn't just some one person reacting, it went through the normal chain of command. And it seems to me that's, that weighs a lot in favor of what the prison decided to do. It is also the same process that results in women officers getting terminated at twice the rate of males, both at Dodge and throughout the system. We're talking about one case here. Well, we are entitled to look at the pattern across the system. You have one minute before you're into your rebuttal time. Thank you. We also think that the evidence of other male officers who engaged in acts of dishonesty and were not terminated, shows that Ms. Perttu was probably in that group of terminated women who would not have been terminated if she were a man. And beyond that, the frosting on the cake is the department's exaggeration of the seriousness of Ms. Perttu's mistake for inmate Redick. And the department's claim to be certain that Redick was not aiming at Perttu, when they weren't certain of that at all. Thank you. I'll reserve the rest of my time if I may. All right. Let's see. Next up is Mr. Koski. Thank you, Your Honor. May it please the court. Clay Koski appearing on behalf of the appelees. And I have two main points. First, the lesser forms of discipline and instead terminate Lisa Perttu's employment. Specifically, Perttu filed a report falsely accusing an inmate of assaulting her, which violated an important work rule and breached her employer's trust. Second, Perttu's evidence, when considered in the light most favorable to her and as a whole, could not lead a reasonable jury to conclude that the DOC discriminated against her because of her sex. And the district court appropriately considered all the evidence as a whole and rejected Perttu's claims. So for these two main reasons, the court should affirm the district court's judgment. I think the strongest evidence in this case is likely the video of the incident. It is not a perfect video. It's somewhat grainy. But it does confirm that Ms. Perttu made a very serious misstatement. And the court may be asking itself, why was it okay to terminate her employment rather than discipline her in another way? And I think there are three main reasons. First, she lied about or made a serious misstatement about an inmate in a context where telling the truth is so very important. Her colleagues and superiors need to be able to trust her in that prison setting. And she cannot effectively do her job if colleagues and inmates think she is dishonest. So she damaged her reputation for truthfulness about inmates. Second, lying or telling a misstatement about an inmate's conduct is much different than making a misstatement about your own conduct. For example, why you were late to work or why you didn't show up one day. Her misstatement could have directly impacted that inmate's liberty. And on top of that, it wasted prison resources and in fact, some law enforcement resources, because the misstatement was that an inmate had assaulted her. In other words, the misstatement was... Excuse me, but we're being told by plaintiff's counsel that this is exaggerated and she couldn't possibly have, that she did not actually accuse Mr. Reddick of assault and her report could not possibly be interpreted that way. I disagree. Why? Well, I think there's really a few things. First, her report was preceded by her going directly to her sergeant and saying, I have been assaulted. When you watch that video, there was no assault. Second, we know from the record and specifically on the state's accord to docket entry 20 at paragraph 6, Warden Pollard confirmed that the most likely consequence of an inmate in Dodge Correctional, which is a classification institution, most likely consequence of that inmate being convicted internally of assault would be that he would end up in a maximum security prison, which is a very serious consequence for him. And in fact, immediately after the assault occurred, he was transferred to segregation. That was before the assault occurred. Again, without this video, if this video didn't exist, it would have been the word of Ms. Pertu against the inmate Reddick. And who do you think that would be believed in that situation? So, again, this brings me to the third point I was about to make, which is that the consequences for Reddick were potentially quite serious. The record reflects, again, that Warden Pollard's declaration in this case explained that he would have been potentially subject to being stationed then at a maximum security prison. During summary judgment, Pertu did not dispute this point. And I would cite the court to docket entry 48, page 28 at paragraph 65. That is the proposed finding of fact response that addressed this issue that or the statement that Warden Pollard made in his declaration. It is true that inmate Reddick was charged with some other violations. The violations he was charged with by this conduct report were assault on employee, disrespect, disruptive conduct, and disobeying orders. And he was convicted of disrespect and disruptive conduct. But the fact that he was even charged with assault resulted in, pursuant to DOC policy, an investigation being initiated by the Dodge County Sheriff's Office. So, again, these serious misstatements in this context resulted in a waste of resources and potential serious consequences for this inmate. I think the court has really, you know, Judge Hamilton had pointed out the really, really disparity between this case and Stalter. This case is a violation of a work rule. And that one of the consequences for that potential violation was termination. That was a discretionary determination that DOC could make. But, nonetheless, the DOC policy did allow for this sort of discipline in this situation. So what do we make of the statistics that the plaintiff has offered, which obviously Chief Judge Peterson noted ought to be pretty troubling for the department? I'll admit that I think that, as a general matter, the statistics are troubling, and I agree with Chief Judge Peterson. However, I also agree with Judge Hamilton in the way that Judge Peterson talked about it was at page nine of his decision. He said that, yes, we have the statistical evidence, which the Seventh Circuit has recognized as potential evidence of discrimination in some cases. But the phrase he used was that the court needs to be able to bridge the gap. The plaintiff has to have evidence from that statistical evidence, another piece of evidence that bridges the gap to an inference of unlawful discrimination. And there was no such evidence here. The examples that the plaintiff relied upon as examples of similarly situated individuals simply did not bridge that gap. And the plaintiff, in fact, disavowed any reliance upon similarly situated as a legal task or standard, said that he wasn't, she was not doing that at the summary judgment stage. And the examples that she relied upon in her summary judgment briefing, and then the multitude of examples that she tried to rely upon in her briefing here are not similarly situated. They have individuals with different supervisors at different institutions, and with regard to the particular conduct that was at issue, we don't even know the details of that conduct to be able to draw a comparison. And the key comparison that would need to be drawn here is that it was a misstatement or a falsehood about an inmate. In none of the examples that she cites in her briefing is the misstatement or false statement about an inmate. And Judge Hamilton, as you pointed out, that's what's key here. In these cases involving inmates, it's crucial that we can trust prison guards. We can trust what they're saying about inmates because their job is difficult enough the way it is. If you have a prison guard who cannot be trusted, either by colleagues and superiors or by the inmates, that is going to be a terrible situation in a prison. Turning to, I'd like to talk a little bit about Ed Wall's testimony. You know, the court I think hit the nail on the head when it said that it would be playing super personnel department if it gave much weight to Mr. Wall's testimony. In this case, Mr. Wall did not in any point in his report say that he believed that we could draw an inference of gender discrimination. He was simply saying that he thought, well, maybe something else was in play, which is really the height of speculation. As we pointed out in our brief, speculation cannot be a basis to reverse summary judgment. And as the district court held, some of what was in his report was speculating. Speculating about whether Mr. Tu was mistaken about something hitting her. And we think that Mr. Wall's testimony is not very helpful and we agree with the district court's analysis on that point. So again, piling on the statistical evidence with Mr. Wall's testimony, with the comparators that aren't really comparators, we don't see how any of that following Ortiz, looking at the whole evidence in one pile, how any of that adds off to an inference of unlawful discrimination in this case. Those are the main points I wanted to make, Your Honors. If you have any further questions, I'd be happy to answer them. None from me. None from you. Thank you. Thank you. Mr. Olson, you have five minutes remaining. Thank you very much. Ms. Pertut did say that she was assaulted, but she also said that she had not been hurt or harmed. She obviously just didn't know that the assault rule required bodily harm. That was a legal mistake, not a misrepresentation of fact. There was no criminal investigation. Dodge relayed something about this incident to the Dodge County Sheriff's Department. The record is silent to indicate that they ever did anything at all with that information. They probably didn't, because if they had, we'd probably be hearing about it. As to similarly situated comparators, we've never said that we have one single male employee who is so identical to Ms. Pertut in terms of his position in the organization and what he was accused of that we can prove our case just by one single comparison. But we have said that when you look at these other cases, you can discern the standard that the department applied in terminating people. And that standard, as Mr. Wall says, would not have been expected to result in a termination in the case of Ms. Pertut. Did you bring any comparators to the attention of the district court, Mr. Olson? Yes, we did. All of the comparators that are listed in our appellate brief come from the proposed findings of fact that we submitted to the district court. And do any of those involve people who were found to have been dishonest about inmate misconduct? Yeah, we point out in our brief that one or two of them appear to have been dishonest about inmate misconduct because if you're accused of dishonesty in a conduct report, that's probably dishonesty about something that an inmate did. But we don't have any of that underlying evidence available? No, we don't. We don't have any more evidence than the termination panel in the central office had. And, you know, when the department says it's so important that this particular mistaken statement was about an inmate's conduct, the jury could decide that that is just not true. Because I'm looking at the list of comparators that the management advisory team was given when they were considering this termination. And that's at document number 32-5 on page three. And in these comparators, if the subject matter of the false statement was so important, you'd think it'd be in here so that the panel making this decision could have known what it was. But it's in for only one of these three comparators. One of them just talks about failed to provide truthful information on an incident report and during interviews. And one of them says documented false information and gave false information during an investigation. So I think that evidence belies the assertion that there was so much importance placed on the subject matter of these false statements. You mentioned a termination panel. I don't, is that the same group of officers or whatever they were that, I think there are four of them that recommended termination? Is that a, is there such a thing as a termination panel? You're not in prison, but I wonder if that's why you referred to that. In the central office, I use that as a shorthand term for the management advisory team on docket 32-5, which is the disciplinary action routing slip. It shows the path of this recommendation for termination all the way up the ladder. And the management advisory team is one of the steps in that path. They're the ones for whom Carrie Byer compared this list of comparators with no subject matter as to two of the three of them. And Carrie Byer also prepared this one page summary of the facts that we discussed in our brief. They're a central office group. We have one minute left. I, I think I've said everything I need to say. Thank you very much for your kind attention. All right. Thanks to both counsel for your arguments, especially under these circumstances, the case is taken under advisement.